IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KARL A. TOMLIN and ROCHELLE TOMLIN as Executors of the Estate of CONSTANCE M. TOMLIN, deceased, Plaintiffs, | : : : : : | CIVIL ACTION |
| v. | : : | |
| UNITED STATES OF AMERICA, et al., Defendants. | : : | No. 14-202 |

**MEMORANDUM**

**Schiller, J.**                                                                                                November 30, 2015

Karl A. Tomlin and Rochelle Tomlin bring this action for medical malpractice on behalf of themselves and the estate of their deceased mother, Constance A. Tomlin ("Tomlin"), against Defendants United States of America ("United States"), Susan Glennon, M.D. ("Dr. Glennon"), James C. King, III, M.D. ("Dr. King"), Advanced Diagnostic Imaging, P.C. ("ADI"), and Bravo Health Advanced Care Center a/k/a Spring Living Well Center ("Bravo"). After visiting Quality Community Health Center ("QCHC"), a federally-funded health center in Philadelphia, Tomlin was referred for a chest x-ray, which was performed at Bravo and interpreted by Dr. King, an employee of ADI. Tomlin never received the results of this x-ray or any other follow-up, and therefore was not diagnosed with lung cancer until she reported to a hospital emergency room nearly a year later. After filing this action, she died as a result of her illness on May 26, 2015. Drs. King and Glennon, Bravo, and ADI now move for summary judgment. Plaintiffs also move for summary judgment against the United States. The Court will grant summary judgment to Dr. King and ADI, as well as Dr. Glennon and Bravo, and deny Plaintiff's summary judgment motion.

**I.     BACKGROUND**

On March 20, 2012, Tomlin went to QCHC, where she was seen by physician assistant Mae Pease ("PA Pease").[1] (*See* Glennon & Bravo Mot. Summ. J. Ex. A [Pease Dep.] at 32.) In response to Tomlin's complaint of "pleuritic chest pain," Pease ordered a chest x-ray and issued a prescription. (Pls.' Opp'n to King & ADI Mot. Summ. J. Ex. A [QCHC Office Note]; Glennon & Bravo Mot. Summ J. Ex B [Pease Script].) On April 5, 2012, Tomlin had the x-ray performed at Bravo. (Glennon & Bravo Mot. Summ. J. Ex. C [Tomlin Dep.] at 84.) Deirdre Santiago, a radiology technologist, performed the x-ray and entered Dr. Glennon's name as the "referring provider," because she was acting as the "doctor of the day" at Bravo. (Pls.' Opp'n to Glennon & Bravo Mot. Summ J. Ex. I [Santiago Dep.] at 66.) However, Dr. Glennon is not a radiologist, and Bravo did not have a doctor on staff who was qualified to read such x-rays. (Glennon & Bravo Mot. Summ J. Ex. E [Aronson Dep.] at 70–71.) Rather, it contracted through its affiliated HMO with ADI to provide remote review of its x-rays. (*Id.* at 69–72.) Accordingly, Santiago sent the film to Dr. King, who interpreted the x-ray. (*See* Glennon & Bravo Mot. Summ. J. Ex. D [King Dep.] at 60.)

Dr. King issued his radiology report on April 5, 2012, the day of Tomlin's x-ray. (Pls.' Opp'n to King & ADI Mot. Summ. J. Ex B [King Report].) He wrote: "Cardiomegaly. Aortic tortuosity. Linear consolidation/atelectasis, or fibrosis in the RIGHT middle lobe and perihilar region. Followup radiographs recommended in 2-4 weeks to document clearing of this indeterminate finding." (*Id.*) After he signed the report, it was available for Bravo to download.

---

[1] QCHC is a federal entity, so all claims against it and its employees are claims against the United States governed by the Federal Tort Claims Act (FTCA).

2

(King Dep. at 61.) Santiago received the report and faxed it to QCHC on April 6, 2012. (King & ADI Mot. Summ. J. Ex. E [Fax Cover Sheet].) Bravo's fax machine automatically inputted Dr. Jayne Brown as the recipient when Santiago entered QCHC's fax number, despite the fact that Dr. Brown no longer worked at the clinic. (Fax Cover Sheet; Santiago Dep. at 53–56; Lingham Dep. at 156.) QCHC received the report, but as a result of an administrative error it never entered the report into Tomlin's chart or notified PA Pease, or her supervising physician Dr. Leila Hardware ("Dr. Hardware"), of the report's receipt. (United States of America Answer to Second Am. Compl. ¶ 44; Glennon & Bravo Mot. Summ J. Ex. L [Lingham Dep.] at 47–48, 164–65.) QCHC employees found the report in 2015 in a box that had been retrieved from off-site storage in order to respond to discovery in this case. (Lingham Dep. at 57–62.)

Rather than attending a follow-up appointment scheduled for April 10, 2012, Tomlin called QCHC and asked for the results of the x-ray. (Tomlin Dep. at 155–57.) She spoke to a receptionist who told her that the doctor was out, but that there was nothing in her file. (*Id.* at 93.) Tomlin testified that the receptionist told her that if there was a problem, a doctor would contact her. (*Id.* at 93–94.) She had no further contact with QCHC. (*Id.* at 158.) On March 20, 2013, she went to the emergency room at Temple Hospital with difficulty breathing. (*Id.* at 107.) She was diagnosed with lung cancer, and subsequently underwent a right lobectomy and chemotherapy. (*Id.* at 111–16.) She died on May 26, 2015. (Suggestion of Death).

Tomlin originally sued in state court on October 8, 2013, and the United States removed. After the Court retained jurisdiction over Defendants' cross-claims, Tomlin filed an Amended Complaint in compliance with the FTCA's exhaustion requirements. (*See* Apr. 4, 2014 Order; Am. Compl.) On October 22, 2015, Plaintiffs filed a Second Amended Complaint substituting

3

Karl Tomlin and Rochelle Tomlin for the decedent and seeking damages under Pennsylvania's Wrongful Death Act and Survival Act. (Sec. Am. Compl.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. Where the moving party bears the burden of persuasion at trial, it must establish the absence of a genuine issue of material fact. *Nat'l State Bank v. Fed. Reserve Bank of N.Y.*, 679 F.2d 1579, 1582 (3d Cir. 1992).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 32 F.3d 768, 777 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

### III. DISCUSSION

#### A. Proximate Causation

Each of the motions filed by Dr. King and ADI, on the one hand, and Dr. Glennon and Bravo, on the other hand, argue that the respective groups of defendants are entitled to summary judgment because they did not proximately cause Tomlin's injuries. (Mem. Supp. King & ADI Mot. Summ. J. at 1); (Mem. Supp. Glennon & Bravo Mot. Summ. J. at 5). Plaintiffs counter that the conduct of both Dr. King and Dr. Glennon substantially contributed to the delay in Tomlin's cancer diagnosis. (Pls.' Mem. Opp'n King & ADI Mot. Summ. J. at 7; Pls.' Mem. Opp'n Glennon & Bravo Mot. Summ. J. at 8.)

As a threshold matter, there is no dispute that Pennsylvania law applies to Plaintiff's claims. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 700 (2004) (noting that under the FTCA, the substantive law of the state where the conduct occurred applies). "A cause of action sounding in negligence for medical malpractice requires proof of four elements: (1) the medical practitioner owed a duty to the patient; (2) the practitioner breached that duty; (3) the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the damages suffered by the patient were the direct result of the harm." *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990).

In Pennsylvania, proximate cause is primarily a question of law that should be determined by the judge prior to presenting the question of actual cause to a jury. *Brown v. Phila. Coll. of Osteopathic Med.*, 760 A.2d 863, 868 (Pa. Super. Ct. 2000). Proximate cause exists when the conduct is a substantial factor in producing the injury. *Vattimo v. Lower Bucks Hosp., Inc.*, 465 A.2d 1231, 1233 (Pa. 1983). In determining whether conduct was a substantial factor in

5

producing an injury, courts consider the following factors enumerated in the Second Restatement of Torts: (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (c) lapse of time. *Id.* at 1234.

In some medical malpractice cases that rely on expert testimony, the plaintiff need only provide evidence establishing that the negligent conduct increased her risk of harm. Proximate causation at that point is established if the jury finds cause-in-fact. *Hamil v. Bashline*, 392 A.2d 1280, 1288 (Pa. 1978). This lower standard is designed to address "cases in which, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm." *Mitzelfelt*, 584 A.2d at 888. The classic example is failure to timely diagnose cancer, which results in a reduced likelihood of survival. *See id.* In these cases, the plaintiff need not provide expert testimony showing that she would have survived had a timely diagnosis been made—only that the delay increased her risk of death. *Billman v. Saylor*, 761 A.2d 1208, 1212 (Pa. Super. Ct. 2000).

Here, however, the Court must first determine whether the actions of Dr. King and Dr. Glennon were too remote to constitute legal causes of the failure to timely diagnose Tomlin's cancer. Only after it answers that question in the negative can the Court apply the increased risk standard to the question of whether the delay in her diagnosis caused her harm. Dr. King, ADI, Dr. Glennon, and Bravo do not argue that Plaintiffs have failed to meet their burden to show medical causation, i.e. that the failure to diagnose her cancer caused Tomlin medical harm.

Instead, they argue that, as a matter of law, their actions were not substantial factors in bringing about the failure to communicate the lab results, which was instead solely caused by the QCHC's loss of the radiology report. (*See* Mem. Supp. King & ADI Mot. Summ. J. at 10–11; Mem. Supp. Glennon & Bravo Mot. Summ. J. at 7.) Therefore, this is not the type of case, described above, where the increased risk standard is necessary because medical probabilities would otherwise make it nearly impossible to prove proximate cause. *Cf. Mitzelfelt*, 584 A.2d at 892. Rather, the Court can straightforwardly consider whether, based on the evidence before it and the Second Restatement factors, the allegedly negligent conduct "was so remote that as a matter of law, the actor cannot be held legally responsible for the harm which subsequently occurred." *Reilly v. Tiergarten, Inc.*, 633 A.2d 208, 210 (Pa. 1993).

      **B.**     **Dr. King and ADI's Motion for Summary Judgment**

There is no genuine dispute between the parties about the material facts relating to Dr. King and ADI's involvement in Tomlin's care. Both parties agree that: (1) pursuant to ADI's contract with Bravo, Santiago transmitted Tomlin's x-ray to Dr. King for interpretation on April 5, 2012, (2) Dr. King read the x-ray and dictated the radiology report, which became immediately available to Bravo, (3) the referrer listed on the x-ray sent to Dr. King was Dr. Glennon, not PA Pease or any other QCHC employee, and (4) Dr. King did not contact any other provider by telephone about the results. (*See* King & ADI Statement of Undisputed Facts; Pls.' Resp. King & ADI Statement of Undisputed Facts.) Plaintiff's expert, Dr. Ethan Halpern, agrees that the content of the radiology report was appropriate. (Pls.' Opp'n King & ADI Mot. Summ. J. Ex. D [Halpern Report].) Therefore, the Court must determine whether the alleged negligent

7

conduct—failing to call the referring physician, Dr. Glennon—proximately caused Tomlin's delayed diagnosis. *See Brown*, 760 A.2d at 868.

The parties disagree on the appropriate interpretation of Dr. Glennon's testimony in which she asserted that she would have "taken steps to make sure that the x-ray report got to the ordering provider," if Dr. King had called her about Tomlin's x-ray. They dispute whether she would have asked Santiago to send it to the provider (which, in fact, Santiago did) or would have called the ordering physician herself. (Glennon Dep. at 150–52.) This, however, is not a genuine dispute about a material fact, but rather pure speculation. Even accepting the possibility that Dr. Glennon, upon receiving a call from Dr. King, would have contacted QCHC directly rather than simply faxing the radiology report, Plaintiff cannot establish proximate cause as a matter of law.

The first factor in the Second Restatement requires courts to consider "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it." *Vattimo*, 465 A.2d at 1234. Here, numerous other factors contributed to QCHC's failure to communicate the contents of Dr. King's report to Tomlin, including Bravo's decision to fax the report without calling PA Pease directly (which may have occurred regardless of Dr. King's actions), Bravo's fax machine's automatic input of an incorrect recipient name, and, most importantly, QCHC's clerical error that resulted in the misfiling of the report. Importantly, QCHC's corporate designee admits that, regardless of the steps taken by Dr. King or Dr. Glennon, QCHC's employee should have entered the radiology report into Tomlin's file and communicated those results to the ordering provider. (*See* Lingham Dep. at 160–64.) Viewing Dr. King's failure to call Dr. Glennon alongside QCHC's error, it is apparent that

QCHC's error had a far greater effect in producing the ultimate harm of the delay in Tomlin's diagnosis.

Similarly, the second factor that courts must consider is "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible." *Vattimo*, 465 A.2d at 1234. By merely transmitting the radiology report to Bravo, Dr. King created a quintessentially harmless situation which could easily have led to the timely communication of its contents to Tomlin. Only the actions of QCHC's employees, for which Dr. King is not responsible, linked Dr. King's failure to call Dr. Glennon to Tomlin's injury.

Plaintiffs cannot show that Dr. King's allegedly negligent act was a substantial factor in causing Tomlin's injury, so the case against Dr. King and ADI may not proceed to the jury. *See Wilder v. United States*, 230 F. Supp. 2d 648, 654 (E.D. Pa. 2002). Therefore the Court grants their motion for summary judgment and dismisses all claims against Defendants Dr. King and ADI with prejudice.

    **C.**    **Dr. Glennon and Bravo's Motion for Summary Judgment**

The parties similarly agree about the material facts relating to Dr. Glennon and Bravo's involvement in this case, namely that: (1) Bravo performed Tomlin's x-ray and received Dr. King's radiology report, (2) Bravo faxed the report to QCHC, albeit with a fax cover sheet identifying the wrong physician as the recipient, and (3) Dr. Glennon, despite being listed on the x-ray as the referring provider, never reviewed the x-ray or took any other steps to ensure that Tomlin received appropriate care. (*See* Glennon & Bravo Statement of Undisputed Facts; Pls.'

9

Resp. Glennon & Bravo Statement of Undisputed Facts.) Plaintiffs argue that Bravo was negligent in identifying the wrong recipient on the fax cover sheet and Dr. Glennon was negligent in failing to review Tomlin's x-ray herself. However, assuming this to be true, Plaintiffs cannot establish that these negligent acts proximately caused Tomlin's delayed diagnosis.

As noted above, while various factors may have contributed to the failure to timely diagnose Tomlin, QCHC's loss of the radiology report had the greatest effect on producing the harm. *See Vattimo*, 165 A.2d at 1234. While a note on the fax cover sheet directing the report to PA Pease's attention no doubt would have been helpful, QCHC should have nevertheless located the correct recipient and placed the report in Tomlin's file. (*See* Lingham Dep. 161–64.) Moreover, if Dr. Glennon herself had reviewed the x-ray, the report would still have been lost. Therefore, the first factor in the Second Restatement counsels against a finding of proximate causation. Moreover, considering the second Restatement factor, while Dr. Glennon and Bravo's actions are nearer in time to the ultimate harm than Dr. King's, they similarly created a situation that was harmless unless acted upon by other forces. *See Vattimo*, 165 A.2d at 1234. They took an accurate x-ray and produced a correct report to QCHC that would have led to Tomlin's timely diagnosis if not for the errors of QCHC's employees.

As a matter of law, Dr. Glennon and Bravo's actions did not proximately cause Tomlin's injury and thus cannot give rise to liability. *See Reilly*, 633 A.2d at 210. Therefore the Court grants their motions for summary judgment and dismisses all claims against Dr. Glennon and Bravo with prejudice.

**D.     Plaintiffs' Motion for Summary Judgment Against the United States**

Plaintiffs and the United States genuinely dispute the content of Tomlin's phone conversation with a receptionist at QCHC following her x-ray. (*See* Pls.' Statement of Undisputed Facts; U.S. Resp. Pls.' Statement of Undisputed Facts.) The United States argues that this conversation bears not only on causation and damages but also on whether QCHC breached a duty to Tomlin. (U.S. Opp'n Pls.' Mot. Summ. J. at 5.) Plaintiff's expert report on the standard of care does not explicitly address this issue. (Pls.' Mot. Summ J. Ex. 6 [Pels Report].) Therefore, Plaintiffs' claims against the United States are not appropriate for summary judgment and will be decided at trial.

**IV.     CONCLUSION**

For the foregoing reasons, the motions for summary judgment filed by Dr. King with ADI, and Dr. Glennon with Bravo, are granted. Plaintiffs' motion for summary judgment against the United States is denied. Defendants Dr. King, ADI, Dr. Glennon, and Bravo are dismissed from this case, and the case will proceed as a bench trial against the United States.